IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHULUUNTSETSEG TSEVEGMID, derivatively on behalf of FIRST SOLAR, INC., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL J. AHEARN, CRAIG KENNEDY, JAMES F. NOLAN, WILLIAM J. POST, J. THOMAS PRESBY, PAUL H. STEBBINS, JOSE H. VILLARREAL, MICHAEL SWEENEY, BRUCE SOHN and ROBERT J. GILLETTE, <br><br> Defendants, <br><br> and <br><br> FIRST SOLAR, INC., a Delaware Corporation, <br><br> Nominal Defendant. | Civil Action No. _____ <br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by plaintiff, a shareholder of First Solar, Inc. ("First Solar" or the "Company"), on behalf of the Company against certain of the Company's current and former directors (the "Individual Defendants," listed individually below). This action seeks to remedy the defendants' breaches of fiduciary duty from June 1, 2008 to March 7, 2012 (the "Relevant Period").

1

2.      First Solar manufactures and sells solar modules with an advanced thin-film semiconductor technology, and designs, constructs, and sells photovoltaic (PV) solar power systems. The Company is the world's largest thin-film PV solar module manufacturer and one of the world's largest PV solar module manufacturers. First Solar provides an economic alternative to conventional electricity, and the related fossil fuel dependence, by enabling clean renewable electricity at affordable prices.

3.      To make solar modules, panels of treated glass are cleaned, heated and coated with a layer of cadmium sulfide followed by a layer of cadmium telluride using the Company's proprietary vapor transport deposition technology, after which the plates are cooled rapidly to increase strength. Next, a series of lasers transform the large single semiconductor-coated plate into a series of interconnected cells that deliver the desired current and voltage output. Busbars, laminate, a rear glass cover sheet and termination wires are applied to the module, the joint box is sealed and each solar module is subjected to a solar simulator and current leakage test.

4.      A manufacturing defect in some of the Company's solar modules manufactured from June 2008 to June 2009 caused the modules to experience premature power loss once installed (the "Manufacturing Defect"). The Company determined the cause of the Manufacturing Defect in June 2009, and in 2009 the Company initiated a voluntary remediation program beyond the standard limited warranty pursuant to which the Company would cover certain costs of remediation efforts.

5.      During the Relevant Period, the Individual Defendants caused the Company to issue improper statements in its public filings, press releases, and conference calls that touted the Company's positive financial results, significant growth, and presented positive forward guidance. Meanwhile, the Individual Defendants failed to disclose, among other things, the

actual and full impact of the Manufacturing Defect on the Company's earnings and the actual costs the Company was incurring in repairing and replacing the defective solar modules that resulted from the Manufacturing Defect. The Individual Defendants knew and had reason to suspect that the Company's reporting and disclosure system was not functioning properly and that the statements being issued during the Relevant Period were materially false and/or misleading. Notwithstanding the above, the Individual Defendants consciously disregarded their duty of oversight and their duty to ensure that a reasonable reporting system was in place, but rather allowed the Company to issue the materially false and misleading statements. When the truth about the Company was revealed, its market capitalization fell by approximately $512.8 million and investors filed a securities fraud class action against the Company.

6.     The Individual Defendants' breaches of fiduciary duties have caused substantial damages to the Company including damage to First Solar's reputation, goodwill, and standing in the business community, as well as the resultant loss of business and business opportunities; legal fees, costs and potentially huge amounts payable in settlement or satisfaction of class action lawsuits alleging violations of federal and state laws, including one securities fraud class action that has already been filed against the Company; the costs incurred in initiating an internal review or an internal investigation into the improprieties engaged in by the Individual Defendants; costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to First Solar; increased cost of capital; and a loss in market value and shareholder equity.

7.     In addition, the Insider Selling Defendants (as defined herein) utilized their knowledge of First Solar's true health and inflated stock price for their own benefit by selling

over $378 million worth of First Solar common stock while in possession of material, adverse non-public information.

8.     Plaintiff, on behalf of the Company, now seeks to hold these fiduciaries accountable for their misconduct.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendant are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  Plaintiff is a citizen of Virginia and no defendant is a citizen of Virginia.

10.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11.     Venue is proper in this district because nominal defendant First Solar is a corporation duly incorporated under the laws of Delaware.

## PARTIES

12.     Plaintiff Chuluuntsetseg Tsevegmid is a current shareholder of First Solar and held First Solar stock during the Relevant Period.  Plaintiff is a citizen of the state of Virginia.

13.     Nominal Defendant First Solar is a corporation organized and existing under the laws of Delaware.  First Solar has its principal executive offices located at 350 West Washington Street, Suite 600, Tempe, Arizona 85281.

14.     Defendant Michael J. Ahearn ("Ahearn") has served as a director of the Company since 2007. Defendant Ahearn currently serves as Chairman of the Board and interim Chief Executive Officer of the Company. Defendant Ahearn co-founded First Solar and served as its Chief Executive Officer from 2000 until 2009 and its Executive Chairman from 2009 to 2010.

4

Defendant Ahearn is currently Chairman and Managing Partner of True North Venture Partners, L.P. Prior to First Solar, defendant Ahearn was Partner and President of JWMA, an equity investment firm (formerly True North Partners, L.L.C.). Prior to joining JWMA, defendant Ahearn practiced law as a partner in the firm of Gallagher & Kennedy. Defendant Ahearn currently serves as a member of the Board of Directors of Cox Enterprises, Inc.; a member of the Board of Trustees of The German Marshall Fund; a member of the Board of Directors of Endeavor Global, Inc.; and a member of the Advisory Board of BDT Capital Partners. While First Solar's stock traded at artificially inflated prices due to the dissemination of improper statements, defendant Ahearn, through the Michael J. Ahearn 2006 GRAT and the Ahearn Family Foundation, sold 2,989,016 shares of First Solar stock for approximately $350,039,185 in proceeds while in possession of material, non-public information concerning First Solar's true business health.  Ahearn is a citizen of Arizona.

15.     Defendant Craig Kennedy ("Kennedy") has served as a director of the Company since 2007. Since 1995, defendant Kennedy has been president of the German Marshall Fund. Defendant Kennedy began his career in 1980 as a program officer at the Joyce Foundation, and served as its president between 1986 and 1992. Defendant Kennedy left the Joyce Foundation to work for Richard J. Dennis, a Chicago investor and philanthropist. During this same period, defendant Kennedy created a consulting firm working with nonprofit and public sector clients. Defendant Kennedy serves as a trustee for various Invesco Van Kampen Funds and Trusts. Defendant Kennedy is a citizen of Washington, D.C.

16.     Defendant James F. Nolan ("Nolan") has served as a director of the Company since 2003. Defendant Nolan served as the Vice President of Operations for Solar Cells, Inc., the predecessor to First Solar. Defendant Nolan worked as a part-time consultant for First Solar from

2000 until 2007. Defendant Nolan previously worked for Westinghouse, Owens Illinois, Glasstech and Photonics Systems. While First Solar's stock traded at artificially inflated prices due to the dissemination of improper statements, defendant Nolan sold 24,000 shares of his First Solar stock for approximately $5,331,399 in proceeds while in possession of material, non-public information concerning First Solar's true business health. Defendant Nolan is a citizen of Arizona.

17.     Defendant William J. Post ("Post") has served as a director of the Company since 2010. Defendant Post joined Arizona Public Service (the largest subsidiary of Pinnacle West and the largest electric utility in Arizona) in 1973 and held various officer positions at APS beginning in 1982 including: Vice President and Controller, Vice President of Finance and Regulation, Chief Operating Officer, President and Chief Executive Officer. Defendant Post became president of Pinnacle West in 1997, Chief Executive Officer in 1999 and Chairman of the Board in 2001. Defendant Post retired as Chairman and Chief Executive Officer of Pinnacle West Capital Corporation in 2009, and he retired from the board of directors of Pinnacle West in 2010. Defendant Post is Chairman of the Board of Swift Transportation Corporation, Chairman of Blue Cross Blue Shield of Arizona, and is a director of Translational Genomics Research Institute and the Thunderbird School of International Management. Defendant Post previously has served as Chairman of Suncor Development Company, Stagg Information Systems, Nuclear Assurance Corporation, Nuclear Electric Insurance Limited, the Institute of Nuclear Power, and El Dorado Investment Company and as a Director of Phelps Dodge Corporation. Defendant Post is a citizen of Arizona.

18.     Defendant J. Thomas Presby ("Presby") has served as a director of the Company since 2006. Defendant Presby retired in 2002 from a 30-year career with Deloitte Touche

Tohmatsu. At Deloitte, defendant Presby held numerous positions including the posts of Deputy Chairman and Chief Operating Officer. Defendant Presby serves as a director of World Fuel Services Corporation, Invesco Ltd. and Tiffany & Co., and Examworks Group, Inc. Defendant Presby previously served as a director of American Eagle Outfitters, Inc., TurboChef Technologies, Inc., PracticeWorks and GreenPoint Financial Corp. Defendant Presby is a Certified Public Accountant.  While First Solar's stock traded at artificially inflated prices due to the dissemination of improper statements, defendant Presby sold 1,000 shares of his First Solar stock for $137,810 in proceeds while in possession of material, non-public information concerning First Solar's true business health.  Defendant Presby is a citizen of Connecticut.

19.     Defendant Paul H. Stebbins ("Stebbins") has served as a director of the Company since 2006. Defendant Stebbins has served as the Chairman and Chief Executive Officer of World Fuel Services Corporation since 2002 and as a director of World Fuel since 1995. Between 2000 and 2002, defendant Stebbins also served as President and Chief Operating Officer of World Fuel. In 1985, defendant Stebbins co-founded Trans-Tec Services, a global marine fuel service company acquired by World Fuel in 1995. Defendant Stebbins is a citizen of Florida.

20.     Defendant Michael Sweeney ("Sweeney") has served as a director of the Company since 2003. Defendant Sweeney has served as Chairman of the Board of Star Tribune Media Holdings, the holding company for the Minneapolis Star Tribune, since 2009. Defendant Sweeney is a partner in Goldner Hawn Johnson & Morrison, Inc. (GHJM), which he joined in 2000, and served as Managing Partner from 2001 through 2008. Defendant Sweeney previously served as President of Starbucks Coffee Company (UK) Ltd. in London and held various operating management and corporate finance roles. After starting his career with Merrill Lynch

in New York and Phoenix, defendant Sweeney built and sold an investment banking boutique. Defendant Sweeney currently serves as a director of Steinway Musical Instruments, Inc.  While First Solar's stock traded at artificially inflated prices due to the dissemination of improper statements, defendant Sweeney sold 24,750 shares of his First Solar stock for $4,418,949.49 in proceeds while in possession of material, non-public information concerning First Solar's true business health.  Defendant Sweeney is a citizen of Minnesota.

21.     Defendant José H. Villarreal ("Villarreal") has served as a director of the Company since 2007. Defendant Villarreal currently serves as a public policy consultant to the law firm of Akin Gump Strauss Hauer & Feld LLP, and was a Partner in the firm from 1994 to 2009. Prior to joining Akin Gump, defendant Villarreal served as an Assistant Attorney General in the Public Finance Division of the Texas Attorney General's office. Defendant Villarreal currently serves as a director of Union Pacific Corporation and PMI Group Inc., and from 1998 to 2006 he served on the Board of Wal-Mart Stores, Inc. Defendant Villarreal recently served as United States Commissioner General to the Shanghai 2010 World Expo. Defendant Villarreal is a citizen of Texas.

22.     Defendant Robert J. Gillette ("Gillette") served as Chief Executive Officer and a director of the Company from 2009 until 2011. Prior to joining First Solar, defendant Gillette served as President and Chief Executive Officer of Honeywell Aerospace. Honeywell Aerospace is part of Honeywell International. Defendant Gillette led Honeywell Aerospace's three main businesses: Air Transport & Regional, Business & General Aviation, and Defense & Space. Prior to this, defendant Gillette served as President and Chief Executive Officer of Honeywell Transportation Systems. Before joining Honeywell in 1996, defendant Gillette had a decade of experience with General Electric Plastics. Defendant Gillette served as a Member of Board of

Governors at Aerospace Industries Association until January 2010.   Defendant Gillette is a citizen of Arizona or California.

23.      Defendant Bruce Sohn ("Sohn") served as President from 2007 until 2009 and as a director of the Company from 2003 until 2009. Defendant Sohn was President of Operations from February 2011 to April 30, 2011. Prior to joining First Solar as President, defendant Sohn worked at Intel Corporation for 24 years. Defendant Sohn is a senior member of IEEE and a certified Jonah. While First Solar's stock traded at artificially inflated prices due to the dissemination of improper statements, defendant Sohn sold 74,750 shares of his First Solar stock for approximately $18,627,694 in proceeds while in possession of material, non-public information concerning First Solar's true business health. Defendant Sohn is a citizen of Arizona.

24.      Defendants Kennedy, Nolan, Post, Presby, Stebbins, Villarreal, Sweeney, Sohn and Gillette are referred to herein as the "Individual Defendants." Defendants Kennedy, Presby and Stebbins are referred to herein as the "Audit Committee Defendants." Defendants Post, Stebbins, Sweeney and Villarreal are referred to herein as the "Compensation Committee Defendants." Defendants Ahearn, Nolan, Presby, Sweeney and Sohn are referred to herein as the "Insider Selling Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25.      By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary duties of good faith, trust, loyalty, and due care, and were and/or are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and/or are required to act in furtherance of the best interests of the Company and its

shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefits. Each director and officer of the Company owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

26.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

27.     To discharge their duties, the officers and directors of First Solar were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial and operational affairs of First Solar. By virtue of such duties, the officers and directors of First Solar were required to, among other things:

    a. Manage, conduct, supervise, and direct the business and internal affairs of First Solar in accordance with the laws and regulations of Delaware, the United States, and pursuant to the charter and bylaws of First Solar;

    b. Neither violate, nor knowingly permit any officer, director, or employee of First Solar to violate applicable laws, rules, and regulations;

    c. Remain informed as to the status of First Solar's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable laws and regulations;

    d. Establish and maintain systematic and accurate records and reports of the business and internal affairs of First Solar and procedures for the reporting of the business and internal affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

    e. Maintain and implement adequate and functioning systems of internal legal, financial and management controls, such that First Solar's operations would comply with all laws, First Solar's financial statements and information filed with U.S. financial regulators and disseminated to the investing public and

First Solar shareholders in the Company's Annual and Quarterly Reports would be accurate, and the actions of its directors would be in accordance with all applicable laws; and

f.  Exercise reasonable control and supervision over the public statements to the securities markets, investors and public shareholders of First Solar by the officers and employees of First Solar and any other reports or other information required by law from First Solar and to examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of First Solar and to make full and accurate disclosure of all material facts concerning, *inter alia,* each of the subjects and duties set forth above.

28.     During the Relevant Period, the Individual Defendants, as directors of First Solar, were privy to confidential and proprietary information concerning First Solar, its operations, products, business relationships, insider deals, financial condition, and future prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and Board meetings, and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

29.     The Individual Defendants are liable as direct participants in, and as co-conspirators, with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to shareholders and the public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after

11

their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

30.     As directors of a publicly-traded company whose common stock was, and continues to be registered with the SEC pursuant to the Exchange Act, and trades on the NASDAQ GS under the ticker symbol FSLR, the Individual Defendants were, and continue to be, governed by the federal securities laws, and had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of First Solar's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations during the Relevant Period violated these specific requirements and obligations. Accordingly, Individual Defendants' breached their fiduciary duties by causing and or recklessly permitting violations of federal securities laws.

## FURTHER SUBSTANTIVE ALLEGATIONS

31.     First Solar manufactures and sells solar modules with an advanced thin-film semiconductor technology, and designs, constructs, and sells photovoltaic (PV) solar power systems. The Company is the world's largest thin-film PV solar module manufacturer and one of the world's largest PV solar module manufacturers. First Solar provides an economic alternative to conventional electricity, and the related fossil fuel dependence, by enabling clean renewable electricity at affordable prices. First Solar was founded in 1999 and launched commercial operations in January 2002.

32.     To make solar modules, panels of treated glass are cleaned, heated and coated

with a layer of cadmium sulfide followed by a layer of cadmium telluride using the Company's proprietary vapor transport deposition technology, after which the plates are cooled rapidly to increase strength. Next, a series of lasers transform the large single semiconductor-coated plate into a series of interconnected cells that deliver the desired current and voltage output. Busbars, laminate, a rear glass cover sheet and termination wires are applied to the module, the joint box is sealed and each solar module is subjected to a solar simulator and current leakage test.

33.     A manufacturing defect in some solar modules manufactured from June 2008 to June 2009 caused the modules to experience premature power loss once installed. The Company determined the cause of the manufacturing defect in June 2009, and in 2009 the Company initiated a voluntary remediation program beyond the standard limited warranty pursuant to which the Company would cover certain costs of remediation efforts.

*The False and Misleading Statements*

34.     On July 30, 2008, the Company issued a press release announcing its financial results for the second quarter of 2008, which ended June 28, 2008. The Company reported revenues of $267.0 million, and net income of $69.7 million or $0.85 per fully diluted share.

35.     In a conference call with analysts that same day, defendant Ahearn stated "[s]econd quarter production was 114.1 megawatts, representing an annualized line capacity of approximately 48 megawatts per line, which is a 5% increase over the first quarter and a 30% increase year-over-year, resulting from continuous run rate, yield and efficiency improvements. Conversion efficiency increased 10 basis points sequentially to an average of 10.7% for the quarter." Defendant Ahearn further stated "I mean, the way … our culture and our approach is really built on a continuous improvement philosophy that basically says if we're at 48 megawatts now, what constrains us from reaching a higher annual throughput rate and that really tells us

where to focus our efforts in order to alleviate constraint that will bring us to the next level."

36.     On July 31, 2008, the Company filed a Form 10-Q for the quarter that ended on June 28, 2008, which was signed by Jens Meyerhoff ("Meyerhoff"), the Company's Chief Financial Officer at that time. The Form 10-Q contained the financial results and financial position of the Company for the quarter that ended June 28, 2008. In addition, the Form 10-Q contained signed certifications by Meyerhoff and defendant Ahearn, stating that the financial information contained in the Form 10-Q was accurate and that any material changes to the Company's internal control over financial reporting had been disclosed.

37.     On October 16, 2008, the Company issued a press release announcing its financial results for the third quarter of 2008, which ended on September 27, 2008. The Company reported revenues of $348.7 million, and net income of $99.3 million or $1.20 per fully diluted share.

38.     In a conference call with analysts on October 29, 2008, defendant Ahearn stated "[a]nd finally we are grounded in reality and we take a pragmatic approach to risk. We do not knowingly ignore uncertain events that could meaningfully impact our business, but rather attempt to identify them, convert them to opportunities where possible and mitigate them where appropriate. We have always tried to be transparent with our key stakeholders with regard to our views and approach to the business and its risk." Later in the same call, defendant Ahearn stated:

> As of reverse, yes so the efficiency internally we maintain a roadmap that really looks at the gamut of opportunities to improve the performance of the modules ranging from transmission of the light into the module, the conversion of the light into current and then heating it outside of the modules through the back contact. And we continue to have a range of engineering solutions that should allow us to continue to improve the performance of the module over time. And as we have stated many times before these improvements tend to be event driven, they don't occur in individual quarters, particularly in order they come out linearly as perhaps say, growth rate or something that that like that much look at. Nevertheless, we believe we are still on track for a long-term plan to achieve our long-terms financials, given the roadmap that we have laid out for ourselves and the laid out which the engineers are able to deploy and qualify new improvements.

39.     On October 31, 2008, the Company filed a Form 10-Q for the quarter that ended on September 27, 2008, which was signed by Meyerhoff. The Form 10-Q contained the financial results and financial position of the Company for the quarter that ended on September 27, 2008. In addition, the Form 10-Q contained signed certifications by Meyerhoff and defendant Ahearn, stating that the financial information contained in the Form 10-Q was accurate and that any material changes to the Company's internal control over financial reporting had been disclosed.

40.     On February 24, 2009, the Company issued a press release announcing its financial results for the fourth quarter and year, which ended on December 27, 2008. For the fourth quarter, the Company reported revenues of $433.7 million, and net income of $132.8 million or $1.61 per fully diluted share. For the year, the Company reported revenues of $1.2463 billion and net income of $348.3 million or $4.24 per fully diluted share.

41.     On February 25, 2009, the Company filed a Form 10-K for the quarter and year that ended on December 27, 2008, which was signed by, among others, Meyerhoff  and defendant Ahearn. The Form 10-K contained the financial results and financial position of the Company for the quarter that ended on December 27, 2008. In addition, the Form 10-K contained signed certifications by Meyerhoff and defendant Ahearn, stating that the financial information contained in the Form 10-K was accurate and that any material changes to the Company's internal control over financial reporting had been disclosed.

42.     On April 29, 2009, the Company issued a press release announcing its financial results for the first quarter of 2009, which ended on March 28, 2009. The Company reported revenues of $418.2 million, and net income of $164.6 million or $1.99 per fully diluted share.

43.     On May 1, 2009, the Company filed a Form 10-Q for the quarter that ended on March 28, 2009, which was signed by Meyerhoff. The Form 10-Q contained the financial results

and financial position of the Company for the quarter that ended on March 28, 2009. In addition, the Form 10-Q contained signed certifications by Meyerhoff and defendant Ahearn, stating that the financial information contained in the Form 10-Q was accurate and that any material changes to the Company's internal control over financial reporting had been disclosed.

44.     On July 30, 2009, the Company issued a press release announcing its financial results for the second quarter of 2009, which ended on June 27, 2009. The Company reported revenues of $525.9 million, and net income of $180.6 million or $2.11 per fully diluted share.

45.     On August 3, 2009, the Company filed a Form 10-Q for the quarter that ended on June 27, 2009, which was signed by Meyerhoff. The Form 10-Q contained the financial results and financial position of the Company for the quarter that ended on June 27, 2009. In addition, the Form 10-Q contained signed certifications by Meyerhoff and defendant Ahearn, stating that the financial information contained in the Form 10-Q was accurate and that any material changes to the Company's internal control over financial reporting had been disclosed.

46.     On October 28, 2009, the Company issued a press release announcing its financial results for the third quarter of 2009, which ended on September 26, 2009. The Company reported revenues of $480.9 million, and net income of $153.3 million or $1.79 per fully diluted share.

47.     On October 30, 2009, the Company filed a Form 10-Q for the quarter that ended on September 26, 2009, which was signed by Meyerhoff. The Form 10-Q contained the financial results and financial position of the Company for the quarter that ended on September 26, 2009. In addition, the Form 10-Q contained signed certifications by Meyerhoff and defendant Gillette, stating that the financial information contained in the Form 10-Q was accurate and that any material changes to the Company's internal control over financial reporting had been disclosed.

48.     On February 18, 2010, the Company issued a press release announcing its

financial results for the fourth quarter and year that ended on December 26, 2009. For the fourth quarter, the Company reported revenues of $641.3 million, and net income of $141.6 million or $1.65 per fully diluted share. For the year, the Company reported revenues of $2.0662 billion, and net income of $640.1 million or $7.53 per fully diluted share.

49.     On February 22, 2010, the Company filed a Form 10-K for the quarter and year that ended on December 26, 2009, which was signed by, among others, James Zhu ("Zhu"), the Company's Chief Accounting Officer, Meyerhoff and defendants Ahearn and Gillette. The Form 10-K contained the financial results and financial position of the Company for the quarter that ended on December 26, 2009. In addition, the Form 10-K contained signed certifications by Meyerhoff and defendant Gillette, stating that the financial information contained in the Form 10-K was accurate and that any material changes to the Company's internal control over financial reporting had been disclosed.

50.     On April 28, 2010, the Company issued a press release announcing its financial results for the first quarter of 2010, which ended on March 27, 2010. The Company reported net sales of $568.0 million, and net income of $172.3 million or $2.00 per fully diluted share.

51.     On April 29, 2010, the Company filed a Form 10-Q for the quarter that ended on March 27, 2010, which was signed by Zhu. The Form 10-Q contained the financial results and financial position of the Company for the quarter that ended on March 27, 2010. In addition, the Form 10-Q contained signed certifications by Meyerhoff and defendant Gillette, stating that the financial information contained in the Form 10-Q was accurate and that any material changes to the Company's internal control over financial reporting had been disclosed.

52.     On July 29, 2010, the Company issued a press release announcing its financial results for the second quarter of 2010, which ended on June 26, 2010. The Company reported net

17

sales of $587.9 million, and net income of $1.84 per fully diluted share.

53.    Later in the day, the Company held a conference call with analysts. Defendant

Gillette represented, in relevant part, the following:

> Finally in Q2, reflected costs associated with the modular replacement program. During the period from June of 2008 to June of 2009, a manufacturing excursion affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in affected modules. The root cause was identified and subsequently mitigated in June of 2009. Ongoing testing confirms the corrective actions are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well under way, and in some cases complete. Some of these efforts go beyond our normal warranted coverage. We accrued the estimated full cost of these additional efforts in our Q2 results….

54.    During the conference call, Defendant Meyerhoff represented, in relevant part, the

following:

> During the second quarter, we accrued $17.8 million in cost of sales for expected module replacement costs and our cost of goods sold. In addition, we accrued $5.6 million of operating expenses associated with this process excursion, bringing our total accrued expenses to $27.4 million at the end of the second quarter.

55.    On August 2, 2010, the Company filed a Form 10-Q for the quarter that ended on

June 26, 2010, which was signed by Zhu. The Form 10-Q contained the financial results and

financial position of the Company for the quarter that ended on June 26, 2010. In addition, the

Form 10-Q contained signed certifications by Meyerhoff and defendant Gillette, stating that the

financial information contained in the Form 10-Q was accurate and that any material changes to

the Company's internal control over financial reporting had been disclosed.

56.    The Form 10-Q included the following statement about the manufacturing defect:

> During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms the corrective actions are effective. We

have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. Accordingly, we have accrued additional expenses of $17.8 million in the second quarter of 2010 and $29.5 million in total to date to cover the replacement of the anticipated affected module population in the field.

57.     On October 28, 2010, the Company issued a press release announcing its financial results for the third quarter of 2010, which ended on September 25, 2010. The Company reported net sales of $797.9 million, and net income of $2.04 per fully diluted share.

58.     On November 1, 2010, the Company filed a Form 10-Q for the quarter that ended on September 25, 2010, which was signed by Zhu. The Form 10-Q contained the financial results and financial position of the Company for the quarter that ended on September 25, 2010. In addition, the Form 10-Q contained signed certifications by Meyerhoff and defendant Gillette, stating that the financial information contained in the Form 10-Q was accurate and that any material changes to the Company's internal control over financial reporting had been disclosed.

59.     The Form 10-Q included the following statement about the Manufacturing Defect:

The $18.3 million increase in other costs for the nine months ended September 25, 2010 was due to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms the corrective actions are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. Accordingly, we accrued additional expenses of $22.4 million in the first half of 2010 and $29.5 million in total-to-date to cover the replacement of the anticipated affected module population in the field. We did not incur any incremental costs during the third quarter of 2010.

60.     On December 14, 2010, the Company issued a press release announcing financial guidance for 2011. The Company forecasted net sales for 2011 between $3.7 and $3.9 billion.

19

Earnings per share were forecasted to grow between $8.75 and $9.50 per fully diluted share, and the Company forecasted approximately $1.0 to $1.1 billion in operating cash flow. In the same press release, defendant Gillette was quoted as stating "First Solar revenue and profit is continuing to grow in 2011."

61.     On February 24, 2011, the Company issued a press release announcing its financial results for the fourth quarter and year that ended on December 31, 2010. For the fourth quarter, the Company reported net sales of $610 million, and net income of $1.80 per fully diluted share. For the year, the Company reported revenues of $2.564 billion, and net income of $7.68 per fully diluted share.

62.     On February 28, 2011, the Company filed a Form 10-K for the quarter and year that ended on December 31, 2010, which was signed by, among others, Zhu and defendants Ahearn and Gillette. The Form 10-K contained the financial results and financial position of the Company for the quarter that ended on December 31, 2010. In addition, the Form 10-K contained signed certifications by Zhu and defendant Gillette, stating that the financial information contained in the Form 10-K was accurate and that any material changes to the Company's internal control over financial reporting had been disclosed.

63.     The Form 10-K included the following statement about the Manufacturing Defect:

The net increase in other costs for 2010 includes $23.7 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms that the corrective actions taken are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. Accordingly, we accrued additional expenses of $30.8 million in 2010 and $37.9 million in total-to-date to cover the replacement of the

anticipated affected module population in the field. Such amounts include $8.5 million in expenses accrued during the fourth fiscal quarter of 2010, reflecting updated best estimates of the total replacement costs, based on our field data and execution to date of the module replacement program.

64.     On May 3, 2011, the Company issued a press release announcing its financial results for the first quarter of 2011, which ended on March 31, 2011. The Company reported net sales of $567 million, and net income of $1.33 per fully diluted share.

65.     On May 5, 2011, the Company filed a Form 10-Q for the quarter that ended on March 31, 2011, which was signed by Zhu. The Form 10-Q contained the financial results and financial position of the Company for the quarter that ended on March 31, 2011. In addition, the Form 10-Q contained signed certifications by Mark R. Widmar ("Widmar"), First Solar's Chief Financial Officer at that time, and defendant Gillette, stating that the financial information contained in the Form 10-Q was accurate and that any material changes to the Company's internal control over financial reporting had been disclosed.

66.     The Form 10-Q included the following statement about the Manufacturing Defect:

Cost of sales for the three months ended March 27, 2010 included $4.5 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. Ongoing testing confirms that the corrective actions taken have been effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. No additional expense was accrued in the first quarter of 2011. $37.9 million in total-to-date has been accrued to cover the replacement of the anticipated affected module population in the field.

67.     On August 4, 2011, the Company issued a press release announcing its financial results for the second quarter of 2011, which ended on June 30, 2011. The Company reported net sales of $533 million, and net income of $0.70 per fully diluted share.

68.     On August 5, 2011, the Company filed a Form 10-Q for the quarter that ended on June 30, 2011, which was signed by Zhu. The Form 10-Q contained the financial results and financial position of the Company for the quarter that ended on June 30, 2011. In addition, the Form 10-Q contained signed certifications by Widmar and defendant Gillette, stating that the financial information contained in the Form 10-Q was accurate and that any material changes to the Company's internal control over financial reporting had been disclosed.

69.     The Form 10-Q included the following statement about the Manufacturing Defect:

Cost of sales for the three months ended June 26, 2010 included $17.8 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. Ongoing testing confirms that the corrective actions taken have been effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. We accrued $41.5 million in total-to-date to cover the replacement of the anticipated affected module population in the field. Such amounts include $3.6 million in expenses accrued during the second quarter of 2011, reflecting updated best estimates of the total replacement costs, based on our field data and execution-to-date of the module replacement program.

70.     On October 26, 2011, the Company issued a press release announcing its financial results for the third quarter of 2011, which ended on September 30, 2011. The Company reported net sales of $1.006 billion, and net income of $2.25 per fully diluted share.

71.     On November 4, 2011, the Company filed a Form 10-Q for the quarter that ended on September 30, 2011, which was signed by Zhu. The Form 10-Q contained the financial results and financial position of the Company for the quarter that ended on September 30, 2011. In addition, the Form 10-Q contained signed certifications by Widmar and defendant Ahearn, stating that the financial information contained in the Form 10-Q was accurate and that any

material changes to the Company's internal control over financial reporting had been disclosed.

72.    The Form 10-Q included the following statement about the Manufacturing Defect:

Cost of sales for the nine months ended September 25, 2010 included $22.4 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. Ongoing testing confirms that the corrective actions taken have been effective. We have been working directly with impacted customers to replace the affected modules and these efforts are in most cases complete or well underway for the remaining cases. These efforts go beyond our limited warranty obligation. We accrued $63.6 million in total-to-date manufacturing excursion expense to cover the replacement of the anticipated affected module population in the field. Such amounts include $25.6 million in expenses accrued during the nine months ended September 30, 2011, reflecting our most recent best estimates of the total replacement costs, based on our field data and execution-to-date of this excursion related module replacement program.

73.    The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts known to defendants or recklessly disregarded by them: a) the actual and full impact of the Manufacturing Defect on the Company's earnings; b) the full cost of repairing the defective solar modules that resulted from the Manufacturing Defect; c) that the financial statements released by the Company failed to account for the charges related to the Manufacturing Defect; and d) that the Company lacked adequate internal and financial controls.

*The Truth Emerges*

74.    On February 28, 2012, after the market closed, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2011. For the fourth quarter, the Company reported net sales of $660 million, and a net loss of $4.78 per fully diluted share. For the year, the Company reported net sales of $2.8 billion, and a net loss of $0.46 per fully diluted share. The Company also disclosed, in relevant part, the following:

The fourth quarter of 2011 was impacted by pre-tax charges of $393 million (reducing EPS by $3.90) associated with a non-cash goodwill impairment for our components business, $164 million (reducing EPS by $1.67) related to warranty and cost in excess of normal warranty expense, and $60 million (reducing EPS by $0.43) related to restructuring activities, as announced in December 2011.

75.     The charge taken by the Company to replace defective panels did not escape notice. *Bloomberg News* noted that in the fourth quarter, the warranty problem led "to warranty claims of $125.8 million in the fourth quarter, or more than half the total spent on the glitch to date. It also put aside $37.8 million to cover future claims." *The Wall Street Journal* reported that the Company "has spent nearly $254 million replacing customers' solar panels that didn't perform as promised and changing its warranty." Mark Bachman, an Avian Securities LLC analyst, noted that the "charges [are] about 10 times what they said they were going to be when they first reported the issue."

76.     On February 29, 2012, the Company filed a Form 10-K for the quarter and year that ended on December 31, 2011, which was signed by, among others, Widmar and defendant Ahearn. The Form 10-K contained the financial results and financial position of the Company for the quarter that ended on December 31, 2011. In addition, the Form 10-K contained signed certifications by Widmar and defendant Ahearn, stating that the financial information contained in the Form 10-K was accurate and that any material changes to the Company's internal control over financial reporting had been disclosed.

77.     The Form 10-K included the following statement about the Manufacturing Defect:

2008-2009 Manufacturing Excursion

During the period from June 2008 to June 2009, a manufacturing excursion occurred whereby certain modules manufactured during that time period may experience premature power loss once installed in the field. The root cause of the manufacturing excursion was identified and addressed in June 2009. Beginning in 2009, we initiated a voluntary remediation program beyond our standard limited warranty pursuant to which we made commitments to customers with systems

containing modules manufactured during the relevant period that we would cover certain costs of remediation efforts. These remediation efforts included module removal, replacement and logistical services and additional compensation payments to customers under certain circumstances. Our best estimate for costs of our voluntary remediation program, as of and in each fiscal period in question, has been based on evaluation and consideration of the then-currently available information, including the estimated number of affected modules in the field, historical experience related to our voluntary remediation efforts, customer-provided data related to potentially affected systems and the estimated costs of performing the logistical services covered under our remediation program.

* * *

In the fourth quarter of 2011, we accrued additional expenses in excess of standard product warranty liability relating to our voluntary remediation program. A principal driver behind such additional accrual was our greater understanding as of year-end, obtained through the processing of thousands of claims as described below, of the number of modules not affected in the manufacturing excursion that needed to be removed (and subsequently replaced) in order for us to be able to identify and remedy the number of modules actually affected by the manufacturing excursion….In response to our communications to customers regarding our intent to undertake a voluntary remediation program, we received more than five thousand customer claims, which covered an installed base greater than our entire production output during the June 2008 - June 2009 timeframe. In our processing of these claims to date, we have determined that we will take remediation actions in accordance with our voluntary remediation program with respect to approximately 1,100 of such claims, approximately an additional 200 claims could, pending receipt of additional information, qualify for remediation, and the balance of approximately 4,000 claims have been or will be rejected as they did not meet the criteria for participation in our voluntary remediation program (including claims containing insufficient data necessary to evaluate them). We have expensed $215.7 million total to-date for the estimated costs of remediating systems affected by modules manufactured during the relevant period, including $145.6 million for remediation expenses beyond our limited warranty obligations and $70.1 million in product warranty expense reflecting the net increase in the expected number of replacement modules required in connection with our remediation efforts….

78.     On this news, First Solar stock fell $4.10 per share or 11%, to close at $32.30 per share on February 29, 2012.

79.     On March 7, 2012, the Company was once again facing scrutiny from analysts. Seeking Alpha quoted solar analyst Aaron Chew from Maxim Capital as stating: "Though we

maintain our Hold rating, our bias has shifted to the downside." Seeking Alpha later noted that the Company has only $110 million in net cash, and stated "[t]his liquidity risk now leaves the stock extremely vulnerable to any news about operational or sales issues."

80.    On this news, First Solar stock fell $1.80 per share or 6.5%, to close at $25.80 per share on March 7, 2012 after high volume trading. In total, First Solar's stock fell from $118.23 per share as of closing on July 29, 2011, the date the Company first revealed the Manufacturing Defect to investors, to $25.80 per share at closing on March 7, 2012, a plummet of more than 78%.

## DAMAGES TO FIRST SOLAR

81.    As a result of Individual Defendants' improprieties, First Solar disseminated improper statements. These improper statements have devastated First Solar's credibility as reflected by the Company's over $512.8 million market capitalization decline.

82.    First Solar also faces damages from a securities class action brought by an investor on March 15, 2012 in the U.S. District Court for the District of Arizona against defendants First Solar, Ahearn and Gillette. Among other things, the class action complaint alleges false and misleading statements and material omissions made by the defendants in that case. Further, the class action complaint alleges insider trades that were effectuated by the defendants in that case to take advantage of artificially inflated share prices before the Company's misconduct was revealed. Accordingly, the Company has and will incur costs in investigating and defending First Solar and certain officers and directors in the class action lawsuit, in addition to potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment.

83.     Further, as a direct and proximate result of Individual Defendants' actions, First Solar has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to: costs incurred in initiating an internal review or an internal investigation into the improprieties engaged in by the defendants; and costs incurred from compensation and benefits paid to the defendants who have breached their duties to First Solar.

84.     Moreover, these actions have irreparably damaged First Solar's corporate image and goodwill. For at least the foreseeable future, First Solar will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have misled the investing public, such that First Solar's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DEMAND WOULD BE FUTILE

85.     Plaintiff brings this action derivatively in the right and for the benefit of First Solar to redress injuries suffered, and to be suffered, by First Solar as a direct result of breaches of fiduciary by the Individual Defendants. First Solar is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

86.     At the time of the filing of this action, First Solar's Board consists of eight (8) directors: defendants Ahearn, Kennedy, Nolan, Post, Presby, Stebbins, Villarreal and Sweeney. Each of these Board members has been named as a defendant in this action. In addition, defendants Ahearn and Gillette have been named as defendants in related securities fraud class action lawsuits.

87.     Plaintiff has not made any demand on the Board to institute the causes of action alleged herein because such a demand would be futile.   First Solar's Board at the time this

Complaint was filed was unable to make an impartial determination as to whether to institute legal proceedings to redress the wrongdoing alleged herein because a majority of its members: (1) face a substantial likelihood of liability for non-exculpated breaches of their fiduciary duties to the Company by their participation or acquiescence in the wrongdoing alleged herein and/or complete failure to perform their oversight duties to the Company, failure to ensure the Company's compliance with legally mandated disclosure standards, and the Insider Selling Defendants' failure to place the interests of the Company above their personal interests; and/or (2) are otherwise not independent and are thus unable to act objectively with respect to a pre-suit demand.

*Substantial Likelihood of Liability for the Entire Board of Directors*

88.    Demand is also futile and excused because all of the Board members are not disinterested because they face a substantial likelihood of liability for the wrongdoing alleged herein.

89.    The Individual Defendants face a substantial likelihood of liability for their breaches of fiduciary duty because each of the Individual Defendants knew and/or had reason to suspect that the Company's reporting and disclosure system was not functioning properly and that the statements disseminated during the Relevant Period were materially misleading. Despite this, the Individual Defendants consciously disregarded their duty of oversight, allowed the Company to issue the materially misleading statements, and failed to ensure that reliable systems of controls were implemented and functioning effectively to prevent the Company from issuing the materially false and misleading statements. Accordingly, the Individual Defendants face substantial exposure to liability for their total abrogation of their duty of oversight.

90.     Specifically, defendants Kennedy, Presby and Stebbins as members of the Audit Committee, had the responsibility to assist the Board in monitoring financial statements, internal controls and the Company's compliance with regulatory requirements. As stated in first Solar's Audit Committee Charter, its members are responsible for: (i) reviewing and discussing with management Forms 10-Q prior to filing; (ii) reviewing and discussing with management Forms 10-K prior to filing; (iii) discuss the Company's press releases, financial information and earnings guidance that are provided to analysts and investors; (iv) reviewing the Company's internal controls and discussing with management material issues of adequacy; and (v) assist management with overseeing the Company's compliance with regulatory requirements. In addition, the Board determined that Presby is qualified as an "audit committee financial expert." As a result of their roles and responsibilities, defendants Kennedy, Presby and Stebbins must have known and/or had reason to suspect that the Company's reporting and disclosure system was not functioning properly and that the statements they were reviewing were materially false and misleading. Yet, defendants Kennedy, Presby and Stebbins wholly abdicated their responsibilities to the Company and its shareholders by consciously disregarding their duty of oversight, allowing the Company to issue the materially false and misleading statements, and failing to ensure that reliable systems of controls were implemented and functioning effectively to prevent the Company from issuing materially false and misleading statements.  Accordingly, defendants Kennedy, Presby and Stebbins face a substantial likelihood of liability and any demand upon them would be futile.

91.     In addition, the magnitude and duration of the alleged wrongdoing was so great that the Individual Defendants must have known and/or had reason to suspect that the statements described above were materially false and misleading.

*The Members of the Board of Directors Lack Independence*

92.     Defendant Ahearn is the Company's Interim Chief Executive Officer. Defendant Ahearn co-founded First Solar and served as its Chief Executive Officer from 2000 until 2009 and its Executive Chairman from 2009 to 2010.  Defendant Ahearn has been Interim Chief Executive Officer since October 25, 2011. Defendant Ahearn is to earn a base salary of $500,000 between 2011 and 2012. Accordingly, defendant Ahearn's principal source of income is based on his employment with the Company.  Because of his dependence on the Company for continued compensation, he is beholden to the Company and lacks sufficient independence with which to render a disinterested decision on whether to pursue the derivative claims.

93.     Defendant Ahearn used the artificially inflated First Solar stock price to his personal advantage. Based on his role in the Company, defendant Ahearn knew the adverse non-public information regarding the Company's financial position. While in possession of this material adverse, non-public information regarding the Company, defendant Ahearn sold 2,989,016 shares of First Solar common stock through the Michael J. Ahearn 2006 GRAT and the Ahearn Family Foundation, for proceeds of approximately $350 million. Thus, rather than disclosing the adverse information to the public, defendant Ahearn used his insider information to secure financial gains for himself.  These sales were made pursuant to Rule 10b5-1 plans, but the Rule 10b5-1 plans were put in place at a time where the Company knew about the manufacturing defect and the costs of repairing the defect. Because defendant Ahearn received personal financial benefits from his insider trading transactions, he is not disinterested. Also, defendant Ahearn faces a substantial likelihood of liability for breaches of his fiduciary duties of loyalty for his insider selling. Since defendant Ahearn has breached his fiduciary duties and is not disinterested, any demand upon him would be futile.

94.     Defendant Presby used the artificially inflated First Solar stock price to his personal advantage. Based on his role in the Company, defendant Presby knew the adverse non-public information regarding the Company's financial position. While in possession of this material adverse, non-public information regarding the Company, defendant Presby sold 1,000 shares of First Solar common stock for $137,810 in proceeds. Thus, rather than disclosing the adverse information to the public, defendant Presby used his insider information to secure financial gains for himself.  This sale was not made pursuant to a Rule 10b5-1 plan. Because defendant Presby received personal financial benefits from his insider trading transactions, he is not disinterested. Also, defendant Presby faces a substantial likelihood of liability for breaches of his fiduciary duties of loyalty for his insider selling. Since defendant Presby has breached his fiduciary duties and is not disinterested, any demand upon him would be futile.

95.     Defendant Nolan used the artificially inflated First Solar stock price to his personal advantage. Based on his role in the Company, defendant Nolan knew the adverse non-public information regarding the Company's financial position. While in possession of this material adverse, non-public information regarding the Company, defendant Nolan sold 24,000 shares of First Solar common stock for approximately $5,331,399 in proceeds. Thus, rather than disclosing the adverse information to the public, defendant Nolan used his insider information to secure financial gains for himself.  These sales were not made pursuant to a Rule 10b5-1 plan. Because defendant Nolan received personal financial benefits from his insider trading transactions, he is not disinterested. Also, defendant Nolan faces a substantial likelihood of liability for breaches of his fiduciary duties of loyalty for his insider selling. Since defendant Nolan has breached his fiduciary duties and is not disinterested, any demand upon him would be futile.

96.     Defendant Sweeney used the artificially inflated First Solar stock price to his personal advantage. Based on his role in the Company, defendant Sweeney knew the adverse non-public information regarding the Company's financial position. While in possession of this material adverse, non-public information regarding the Company, defendant Sweeney sold 24,750 shares of First Solar common stock for $4,418,949.49 in proceeds. Thus, rather than disclosing the adverse information to the public, defendant Sweeney used his insider information to secure financial gains for himself.  These sales were not made pursuant to a Rule 10b5-1 plan. Because defendant Sweeney received personal financial benefits from his insider trading transactions, he is not disinterested. Also, defendant Sweeney faces a substantial likelihood of liability for breaches of his fiduciary duties of loyalty for his insider selling. Since defendant Sweeney has breached his fiduciary duties and is not disinterested, any demand upon him would be futile.

97.     In addition, defendants Ahearn, Kennedy, Presby and Stebbins have a history of business and interpersonal relationships. Defendant Ahearn is a member of the Board of Trustees for the German Marshall Fund, and defendant Kennedy is the President of the German Marshall Fund. Defendant Kennedy is also a trustee for various Invesco Van Kampen Funds and Trusts, and defendant Presby is a member of the Board of Directors for Invesco. Finally, defendant Presby is a member of the Board of Directors for World Fuel Services Corporation, for which defendant Stebbins is Chief Executive Officer and Chairman of the Board. Accordingly, a substantial relationship exists between defendants Ahearn, Kennedy, Presby and Stebbins, making demand upon them is futile.

98.     Lastly, plaintiff has not made a demand on the Board to bring the causes of action alleged herein because such a demand would be a futile and useless act for the following additional reasons:

    a.   The Board members, because of their inter-related business, professional and personal relationships with the Individual Defendants, have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company as requested herein.

    b.   The Board members, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise same. Each of the Board members exhibited a sustained and systematic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness.

    c.   In order to bring this suit, the Board members would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

    d.   The acts complained of constitute violations of the fiduciary duties owed by First Solar's officers and directors and these acts are incapable of ratification.

    e.   First Solar has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board members have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for First Solar any part of the damages First Solar suffered and will suffer thereby.

    f.   The actions of the directors have impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands.

    g.   Any suit by the directors of First Solar to remedy these wrongs would likely expose the Individual Defendants and First Solar to further violations of securities laws which could result in additional civil actions being filed against one or more of the Individual Defendants, thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves.

99.     Accordingly, for all of these reasons, making a pre-suit demand on the Board would be futile and is therefore excused.

100.    Plaintiff has not made a demand on the shareholders of First Solar to institute this action because such demand would be a futile and useless act for at least the following reasons: (a) First Solar is a publicly held company with approximately 86.49 million shares outstanding, and thousands of shareholders; (b) making demand on such a large number of shareholders would be impossible for Plaintiff, who has no way of learning the names, addresses or phone numbers of all the Company's shareholders; and (c) making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

<u>**COUNT I**</u>

**AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY**

101.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

102.    The Individual Defendants all owed a fiduciary duty to First Solar and its stockholders, the duty to exercise loyalty, good faith, due care and diligence in the management and administration of the affairs of the Company, as well as in the auditing and financial reporting of the Company, and owed the duty of full and candid disclosure of all material facts relating thereto.

103.    As fiduciaries, to discharge these duties, the Individual Defendants were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of First Solar.

104.    In performing the aforementioned services, the Individual Defendants all breached their fiduciary duties, causing damages to First Solar, by, *inter alia,* (i) failing to properly implement, oversee and maintain appropriate and adequate internal controls, practices and procedures for First Solar and ensure that a proper reporting system was in place; (ii) failing

to ensure that First Solar operated in compliance with all applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements and restricting the misuse of material non-public information; (iii) failing to ensure that First Solar not engage in any unsafe, unsound, or illegal business practices; and (iv) causing First Solar to be sued for, and exposed to, liability for violations of the federal securities laws.  The improprieties described herein would not have occurred but for the Individual Defendants' intentional wrongdoing and/or conscious or reckless disregard for their oversight responsibilities.

105.    The Individual Defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, First Solar to suffer substantial monetary damages as a result of the wrongdoing herein, as well as further and even greater damage in the future, including, among other things:

a. damage to First Solar's reputation, goodwill, and standing in the business community, as well as the resultant loss of business and business opportunities;

b. legal fees, costs and potentially huge amounts payable in settlement or satisfaction of class action lawsuits alleging violations of federal and state laws;

c. the costs incurred in initiating an internal review or an internal investigation into the improprieties engaged in by the defendants;

d. costs incurred from compensation and benefits paid to the defendants who have breached their duties to First Solar.

e. increased cost of capital; and

f. a loss in market value and shareholder equity.

106.    First Solar has been directly and substantially injured by reason of the Individual Defendants' intentional breach and/or reckless and conscious disregard of their fiduciary duties

to the Company. Plaintiff, as a shareholders and representatives of the Company, seek damages and other relief for the Company, in an amount to be proven at trial.

107.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT II

**AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT**

108.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

109.    By their wrongful acts, omissions, and breaches of fiduciary duties, the Individual Defendants were unjustly enriched at the expense of and to the detriment of First Solar.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to First Solar.

110.    The Insider Selling Defendants sold First Solar stock while in possession of material, adverse, non-public information that, in being concealed, allowed the share price of First Solar stock to remain artificially inflated.  As a result, the Insider Selling Defendants profited from their misconduct and were all unjustly enriched through their exploitation of material and adverse inside information.

111.    Plaintiff, on behalf of First Solar, seeks restitution from the Individual Defendants and the Insider Selling Defendants, and each of themselves, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants and the Insider Selling Defendants, from or in the course of their wrongful conduct and fiduciary breaches.

112.    Plaintiff, on behalf of First Solar, has no adequate remedy at law

36

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.      Directing First Solar to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance policies: (1) a proposal to strengthen the Board's supervision of operations and to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; (2) a proposal to strengthen First Solar's oversight of its disclosure procedures; (3) a provision that will adequately control insider selling; and (4) other measures to appropriately test and then strengthen, the internal audit and control functions that are so lacking in the Company.

C.      Awarding to First Solar restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants while they were in breach of their fiduciary duties;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: April 3, 2012

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Joseph J. Farnan, III (Bar No. 3945)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Telephone:  (302) 777-0300
mfarnan@farnanlaw.com

*Counsel for the Plaintiff*

*Of Counsel*:
**LEVI & KORSINSKY, LLP**
Nicholas I. Porritt
Levi & Korsinsky, LLP
1101 30th St., NW, Suite 115
Washington, DC 20007
Telephone:  (212) 363-7500